985 F.2d 552
 NOTICE: First Circuit Local Rule 36.2(b)6 states unpublished opinions may be cited only in related cases.
Peter GRABLER, Plaintiff, Appellant,
v.
Israel ROIZMAN, et al., Defendants, Appellees.
 No. 92-1349.
 United States Court of Appeals,
First Circuit.
 February 5, 1993
 
 APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF MASSACHUSETTS
 Peter Grabler on brief pro se.
 Brian P. Flaherty and Wolf, Block, Schorr and Solis-Cohen on brief for appellee Israel Roizman.
 D.Mass.
 REMANDED AND AFFIRMED.
 Before Selya, Cyr and Boudin, Circuit Judges.
 Per Curiam.
 
 
 1
 On March 7, 1991, appellant Peter Grabler, a resident of Massachusetts, filed a complaint against appellee Israel Roizman, a resident of Pennsylvania. Jurisdiction was based on diversity of citizenship. Grabler essentially claimed that Roizman had breached an agreement to purchase all of Grabler's shareholdings in Benchmark Broadway Corporation and Benchmark Developers, Inc. Among other forms of relief, Grabler requested damages (unspecified) and an accounting. He also included allegations that Roizman had committed fraud, engaged in economic duress and had violated M.G.L. c. 93A and Section 10(b) and Rule 10b-5 of the 1934 Securities Exchange Act. The details of the complaint are not relevant to this appeal because Roizman agreed to pay Grabler approximately $96,000 for the stock.
 
 
 2
 In May 1991, Roizman filed an answer and a counterclaim. The counterclaim, which essentially forms the basis for this appeal, concerns the deterioration in the business relationships among Grabler, Roizman and a third person, David Kohen. These three individuals are the sole shareholders in Benchmark Properties Corporation ("Benchmark").* Benchmark is in the business of real estate development. Specifically, it is a general partner in two housing projects-Elm Hill Limited Partnership ("Elm Hill") and Blue Hill Limited Partnership ("Blue Hill"). Benchmark has a 50% interest in each project. The other general partners are Benchmark Financial Group, Ltd. ("BFGL") and an individual, Frank Jones. Each project also has a limited partnership as its limited partner. Grabler and Kohen are the sole shareholders of BFGL.
 
 
 3
 In June 1991, the parties reached a final settlement and the case was dismissed. Paragraphs 2 through 4 of the settlement concern how much Roizman owed Grabler for the stock purchase and how Roizman was to effect payment to Grabler. Paragraph 7 of the settlement stated:
 
 
 4
 After Grabler and Roizman have reached agreement regarding the allocation of expenses and partnership distributions in connection with Elm Hill Housing Limited Partnership, Blue Hill Housing Limited Partnership and Benchmark Properties, Inc., Grabler shall add Roizman as a required signatory on the Massachusetts escrow account, as well as all savings, checking and other banking accounts maintained by Elm Hill Housing Limited Partnership, Blue Hill Housing Limited Partnership and Benchmark Properties, Inc. Grabler and Roizman agree that they will proceed in good faith to affect [sic] a resolution of this issue.
 
 
 5
 Unfortunately, the obligation to use good faith failed to ensure the settlement of the disputes concerning Elm Hill, Blue Hill and Benchmark pursuant to the above paragraph. Also in dispute was whether Grabler was due interest on the payment for the stock purchased by Roizman. Thus, on October 15, 1991, the district court granted Roizman's motion to reopen and set the case for hearing.
 
 
 6
 The specific claims presented at that time by Roizman were as follows: (1) Grabler and Kohen caused Benchmark to pay all of certain expenses incurred by Blue Hill and Elm Hill, despite the fact that Benchmark only had a fifty percent interest in each project, and the excess costs should be deducted from the profits of Blue Hill and Elm Hill; (2) Grabler and Kohen each received salaries from Benchmark to which they were not entitled and, having reimbursed Benchmark for part of the salaries, still owed Benchmark approximately $23,000; (3) Blue Hill incurred expenses for deleading and $18,200 of these expenses were "double deducted" from the profits of Blue Hill; (4) Benchmark paid for Grabler's personal phone calls in an estimated amount of $2563; and (5) Benchmark, at the end of 1989, had $50,529 in development cash (profits from both Elm Hill and Blue Hill) which should have been distributed to the Benchmark shareholders, Roizman being entitled to one-third of that amount.
 
 
 7
 The district court ultimately found in Roizman's favor on these five claims, holding that he "is owed the sum of $37,335 as the appropriate allocation of expenses and partnership distributions in connection with Elm Hill Housing LP, Blue Hill Housing LP and Benchmark Properties Corporation ("BPC")...." See Order and Judgment, p 2. This order also provided that
 
 
 8
 [s]ubject to making provision for the payment of the reasonable expenses of BPC in the ordinary course of business, Peter Grabler and Israel Roizman are directed to take all appropriate action to effect the prompt payment of $37,335 to Israel Roizman from the future profits of BPC, such payments to be arranged in such fashion as to have the same economic effect as if these payments had been made in the ordinary course.
 
 
 9
 Id. p 3. The judgment finally stated that if Grabler and Roizman were not able to agree on a method to effect the payment of $37,335 to Roizman, the court would appoint an independent auditor to recommend how the payment should be made. Id. p 4.
 
 DISCUSSION
 
 10
 Grabler attacks the district court's findings on four out of the five claims asserted by Roizman.* * He also argues that he should have been awarded interest on the $96,000 owed to him for Roizman's failure to pay for the stock. We review the district court's factual findings under the clearly erroneous standard.
 
 
 11
 If the district court's account of the evidence is plausible in light of the record viewed in its entirety, the court of appeals may not reverse it even though convinced that had it been sitting as the trier of fact, it would have weighed the evidence differently. Where there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous."
 
 
 12
 Anderson v. Beatrice Foods Co., 900 F.2d 388, 392 (1st Cir.) (quoting Anderson v. City of Bessemer City, 470 U.S. 564, 573-74 (1985)), cert. denied., 111 S.Ct. 233 (1990). In this case, which depends heavily on the inferences to be drawn from conflicting views of the facts, we may not substitute our opinion as to conclusions reached by the district court absent clear error. Id. at 392. Keeping this standard in mind, we turn to the disputed findings.
 
 A. The Counterclaims
 
 13
 1. Roizman asserts that during 1988, 1989 and 1990 Benchmark incurred certain expenses connected with its operation of Elm Hill and Blue Hill. Pages D, E and F of Trial Exhibit 6 reflect these costs for each year. In total, Benchmark paid $221,454 for the years in question. Roizman's basic claim is that Benchmark should have been charged for only half of this amount because it only had a fifty percent interest in each project. That is, Elm Hill and Blue Hill should have absorbed half of these expenses. As Roizman explained during trial:
 
 
 14
 The basis is as follow[s]: When in this industry of low income housing when you have a partnership [Benchmark] that operates two projects, and that's it, and this partnership is supposed to get income for management fee[s], but does not receive any management fee because the project is not healthy financially to pay the management fee, and there is an expense of rent, taxes, interest, copying, office supply, and everything else that shows in RD, E and F. When you don't have an income to this project, to this company, there is someplace where the money has to be paid from. And the only place where the money can be paid is from profit that comes in from the two entities and that's Elm Hill and Blue Hill.
 
 
 15
 App. I, Tab 1, at 40.
 
 
 16
 As a result, Roizman concludes, the profits of both limited partnerships should have been reduced by their respective shares of the $221,454 in expenses incurred by Benchmark. Accordingly, Note # 1 on page A of Trial Exhibit 6 reflects a deduction in the profits of Blue Hill of $112,942. Similarly, Note # 1 of page B of Trial Exhibit 6 shows a reduction in Elm Hill's profits of $108,512.***
 
 
 17
 Grabler claims that these calculations are wrong. He first argues that because Benchmark was running projects in addition to Blue Hill and Elm Hill, see Trial Exhibit 6, at pages J and K, these other projects also should have absorbed some of Benchmark's costs. Although not entirely clear, Roizman's accountant, Stuart Briefer (who also had been the accountant for Benchmark and the limited partnerships), testified that the costs listed in Trial Exhibit 6 were not all of Benchmark's costs for the years 1988-1990. App. I, Tab 2, at 64. Rather, the inference from the testimony is that the amounts on pages D, E and F were Benchmark expenses that related solely to Elm Hill and Blue Hill. Id. at 64-65. Grabler did not submit any evidence that would contradict Briefer's testimony.****
 
 
 18
 Next, Grabler contends that an independent auditor's report, see App. III, Tab 7, at 7 and Tab 8, at 9, demonstrates that Blue Hill and Elm Hill each paid about $57,811 for their own respective organizational costs. However, Grabler did not point to any documentary or other evidence that this money was spent on the same items listed on pages D, E and F of Trial Exhibit 6. Indeed, there is no explanation concerning exactly how the independent auditor's report relates to the payment of Benchmark's expenses.
 
 
 19
 Grabler also alleges that Benchmark in fact received income in the form of management fees for 1988-1990, but assigned this income to another company, Benchmark Apartment Management Corp. As Grabler never put in evidence any agreements concerning the assignment of such fees or any documents indicating the dollar amounts of these fees, we cannot say that the district court's decision to credit Roizman's view of the evidence was plainly wrong.
 
 
 20
 2. Roizman claims that $18,200-which reflects a payment for deleading at the Blue Hill housing project-was erroneously "double-deducted" from the profits of Blue Hill. Thus, as reflected on page A of Trial Exhibit 6, $18,200 was added to the calculation of Blue Hill's profits. To support his position, Roizman relies on a document entitled "Calculation of Syndication Profits," Exhibit RO, # 5, and a record of Syndication Account Transactions for Blue Hill. Trial Exhibit 7, at 4.
 
 
 21
 It is undisputed that Blue Hill has two accounts-syndication and operations. Under this arrangement, the operations account is funded by the syndication account. It also is undisputed that most of the expenses for the deleading were paid from the syndication account, except for the $18,200 which, for some reason, was paid from the operations account. According to Briefer's testimony, in calculating Blue Hill's profits, one of the expenses listed in RO # 5 is an "operating deficit" of $75,000. App. I, Tab 3, at 17-19 and App. II, Tab 1, at 17-20. However, this deficit was reduced by $18,200-the amount for deleading which had been paid out of the operations account. Id.
 
 
 22
 Although not free from doubt, it appears that Roizman is arguing that the "double deduction" occurred when $75,000 was wired from the syndication account to the operations account in December 1990. See Trial Exhibit 7, at 4. Briefer testified that only $56,800 should have been transferred. App. I, Tab 2, at 61. As a result, not only did the operations account lay out $18,200 for deleading, but by transferring the full $75,000, the syndication account also was charged $18,200.
 
 
 23
 Grabler first argues that Exhibit RO was never admitted in evidence and that, in any event, it was "superseded" by Exhibit 7. Exhibit RO contains the underlying documents from which Trial Exhibit 6 was prepared by Roizman and Briefer. The district court admitted Exhibit 6 in evidence on the second day of trial. App. I, Tab 2, at 32. It later described RO as "part of exhibit 6," App. I, Tab 2, at 59, and referred to it during the course of the trial. As such, it is plain that RO was considered as admitted in evidence by the district court.
 
 
 24
 As for Exhibit 7, it is a memorandum, dated September 20, 1991, from Kohen to Roizman. Page 4 reflects Blue Hill syndication account transactions for 1990 and 1991. Grabler points out that Exhibit 7 does not list $18,200 as a deduction. He then makes the observation that RO # 5 reflects only an "estimate" of Blue Hill syndication profits. From this he concludes that the $18,200 was accounted for only once-when it was paid out from the operations account.
 
 
 25
 Based on the evidence and testimony, we think that the district court's decision to credit Roizman's explanation was not clearly erroneous. Exhibit RO # 5 was prepared on February 8, 1991. At this time, the operations account already had paid the $18,200 for deleading. Indeed, according to Grabler, the operations account paid this amount in December 1990. This is the same time that $75,000 from the syndication account was wired to the operations account. See Trial Exhibit 7, at 4. To this extent, it appears that the calculation concerning the operations deficit of $56,800 (the $75,000 minus $18,200) is not an estimate.
 
 
 26
 3. Roizman's claim that Grabler and Kohen agreed to return to Benchmark salaries they had received is well supported by the evidence. In fact, in his brief, Grabler candidly admits that he and Kohen "repaid all but $7,800 of the salary they had each received in 1989" to Benchmark.* * * *n Appellant's Brief, at 33. This admission lends direct support to Roizman's contention that Kohen and Grabler had, in fact, agreed to repay the salaries they had received in 1989. In the absence of any evidence to the contrary, the district court's finding that Benchmark still is owed approximately $23,000 for salary reimbursement is not clearly erroneous.
 
 
 27
 4. Roizman claims that during 1988, 1989 and part of 1990 Grabler charged all of his personal calls to Benchmark. To support this assertion, Roizman submitted four cellular one phone bills dated November 11, 1988, January 8, 1989, July 6, 1989 and September 7, 1989. According to Briefer's testimony, see App. I, Tab 1, at 65-70, he reviewed the above bills, identified Grabler's personal phone charges, added them up, determined an average monthly figure and multiplied it by the number of covered months. Page L of Trial Exhibit 6 contains Briefer's calculations. It reveals that based on the four phone bills, the average amount of personal phone calls is $82.66. Thus, for the period June 1988 to December 1990, Benchmark allegedly paid approximately $2,563 for Grabler's personal phone calls. Page H of Trial Exhibit 6, which contains the summary of how the profits of Benchmark should be adjusted, therefore indicates that Grabler owes Benchmark $2563.
 
 
 28
 Grabler first argues that the claim must fail because the telephone bills should not have been admitted in evidence under Fed. R. Evid. 1006 (admission of summaries). Second, he points out that Briefer testified that he had no recollection concerning whether Benchmark actually had paid these bills. App. I, Tab 3, at 25. Indeed, Briefer stated that he could not "recall what entity paid for the bills." Id. We believe that, even under the clearly erroneous standard, this claim must fail. Therefore, we do not address the evidentiary question.
 
 
 29
 Simply stated, how much Roizman might be due in damages would depend on which entity paid the phone bills. Assuming Roizman's figures are accurate, and Grabler owes Benchmark $2,563, Roizman might be entitled to recover as much as one-third. However, if Blue Hill, Elm Hill or some other entity paid these bills, the $2,563 repayment would not go directly to Benchmark. As a result, Roizman would not receive one-third. For example, if one of the limited partnerships paid the phone bills, Grabler would reimburse the limited partnership, and Benchmark, as a fifty percent owner, might be entitled to as much as one-half of $2,563 or $1,281.50. Roizman's share would be reduced to approximately $427. As Roizman failed to establish who paid the phone bills, on the present record it is impossible to calculate the amount of any damages due.
 
 B. Interest on the Stock Transaction
 
 30
 The final order of the district court regarding the disbursement of the purchase price of the stock (which had been held in the registry of the district court), stated, subject to certain preconditions not relevant to this appeal, that
 
 
 31
 the sum of $96,333.84 shall be released by the Clerk from the Registry of this Court to Peter Grabler, representing final payment to Grabler for his 100 shares of common stock of Benchmark Broadway Corporation and Benchmark Developers, Inc., each, pursuant to paragraph 2 of the Stipulation of 6/28/91.
 
 
 32
 Order of Court, dated November 1991, reproduced in App. III, Tab 17 (emphasis added).
 
 
 33
 Grabler argues that the November 1991 Order only applies to paragraph 2-the underlying obligation of Roizman concerning the purchase price for the stock-and not to paragraph 5 which, he asserts, addresses interest on the purchase price. Grabler also avers that contrary to Roizman's statement in Roizman's draft order (which the district court adopted) he (Grabler) never agreed to the language in Roizman's draft. Grabler points out that the draft order he submitted to the court, App. III, Tab 18, did not specify that the $96,000 was a "final payment."
 
 
 34
 We are unable to ascertain any basis in the record for Grabler's claim that he is due interest on the purchase price for the stock notwithstanding the final judgment of the court.* * * * * * Specifically, he has not carried his burden of demonstrating that paragraph 5 of the June Stipulation applied to the stock purchase. In any event, it is not clear from the record how such interest would have been calculated and Grabler, in support of his claim to interest, has not even established the period during which such interest would have accrued. Consequently, we decline to disturb the final judgment of the district court regarding this claim.
 
 C. Rule 19
 
 35
 Grabler finally argues on appeal that the district court failed to join Kohen, Benchmark, Blue Hill, Elm Hill, BFGL, Jones and the limited partners of Blue Hill and Elm Hill as indispensable parties under Fed. R. Civ. P. 19. We note in this context that Grabler never filed a Rule 19 motion for joinder. Nonetheless, the district court was aware that it had only Grabler and Roizman before it when it entered judgment and acknowledged that it was directing enforcement of the June stipulation between Grabler and Roizman.******* For the reasons stated below, it would be premature to address Grabler's Rule 19 claim at the present time.
 
 
 36
 First, Grabler specifically promised to exercise "good faith" efforts to reach an "agreement regarding the allocation of expenses and partnership distributions" in connection with Benchmark and the limited partnerships. June Stipulation, p 7. He entered into the stipulation, which the court treated as an enforceable contract at trial, knowing that the resolution of the accounting disputes might require action on behalf of Benchmark, Blue Hill, Elm Hill and others.
 
 
 37
 Second, after both Grabler and Roizman filed post-trial motions requesting enforcement of the court's final order, Roizman's counsel filed a letter with the court indicating that "the parties have been able to agree in [sic] the manner in which to carry out the Court's Order." Thus, it appears that the means are available with which to enable Grabler to effect payment to Roizman. Even if any Rule 19 claim has not been waived, it clearly was not addressed below, and is unripe for review. For the present, therefore, issues relating to the enforcement of the district court order are properly presented to that court in the first instance.
 
 
 38
 For the foregoing reasons, the case is remanded to the district court for further proceedings consistent with this opinion. The judgment of the district court is affirmed, except as concerns the award of $2,563 to Roizman. SO ORDERED.
 
 
 
 *
 Grabler and Kohen are directors of Benchmark; Roizman holds no office. All decisions concerning Benchmark must be by a unanimous vote of the three shareholders
 
 
 **
 Grabler does not challenge on appeal the district court's conclusion that, at the end of 1989, Benchmark should have distributed to the shareholders $50,529 as profits. Issues not raised on appeal are waived. Cf. Pignons S.A. de Mecanique v. Polaroid Corp., 701 F.2d 1, 3 (1st Cir. 1983) (issues not presented in initial brief are waived). As for Grabler's contention that Roizman did not have "clean hands," it was not raised below and is thus forfeited on review. Johnston v. Holiday Inns, Inc., 595 F.2d 890, 894 (1st Cir. 1979)
 
 
 ***
 Although Benchmark has a fifty percent interest in each project, Blue Hill was charged with fifty-one percent of Benchmark's costs and Elm Hill was charged forty-nine percent. There is no explanation for this difference but, in any event, it is not challenged on appeal
 
 
 ****
 Similarly, Grabler's claim that there were no charges for ordinary expenses such as telephone, rent and copying listed on the pages concerning these other projects seems irrelevant, without more, to the question whether Elm Hill and Blue Hill should have been charged with some of Benchmark's expenses
 
 
 *****
 Grabler's argument that he and Kohen each retained $7,800 because Roizman allegedly received $7,800 in extra salary is not relevant to the question whether an agreement concerning repayment existed
 
 
 ******
 Indeed, the only reference the district court made to an interest claim by Grabler was its statement that it was not persuaded that Roizman was required to pay interest on the sum of $102,441. App. II, Tab 2, at 101, which amount appears to relate to the Flipper Temple deal in Atlanta, not the stock purchase agreement between Grabler and Roizman
 
 
 *******
 Now, it's important to understand that there are before the Court only Mr. Grabler and Mr. Roizman. None of the corporations have been joined and Mr. Kohen has not been joined. The Court infers, but makes no finding, that one of the reasons these parties were not enjoined was it would destroy the diversity jurisdiction ... which is necessary for this Court to act and the disputes arising out of the settlement agreements would then have to be disposed of in thestate court
 App. II, Tab 2, at 94. As for Grabler's ability to effect the judgment, the district court stated:
 [W]hile it's certainly appropriate for me to resolve all matters as between Mr. Grabler and Mr. Roizman and indeed equitably to make sure that those two parties who are before the Court give effect to the Court's judgment, I have no right to enter orders, nor have I yet entered ... any order against Mr. Kohen....
 ....
 So, I can imagine saying, and correct me, that the accountings shall be as I decreed them and I order the parties before the Court to give effect to the accounting resolution that I have made and leave it at that.
 Id. at 67.